UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

[UNDER SEAL]              )
                          ) CIVIL ACTION NO.:
        Plaintiffs,       )
                          )
v.                        )
                          )
[UNDER SEAL]              )
                          )
        Defendant.        )
                          )
                          )

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2017 MAR -6  P 4: 29

WILLIAM W. BLEVINS
CLERK

17-1915

SECT. E MAG. 2

## QUI TAM COMPLAINT

## FILED UNDER SEAL

DO NOT FILE

WITH PACER

X Fee 400.00
__ Process_____
X Dktd_____
__ CtRmDep_____
__ Doc. No.____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. THOMAS PROSE <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL CONTROL, LLC and PROVIDER HEALTH SERVICES, LLC <br><br> Defendants. | CIVIL ACTION NO.: 17-1915 <br><br> QUI TAM COMPLAINT <br><br> JURY TRIAL DEMANDED <br><br> FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2) <br><br> SECT. E MAG. 2 |

## I. INTRODUCTION

*Qui Tam* Relator Thomas Prose, M.D., through his counsel and on behalf of the United States of America, brings this Complaint against Central Control, LLC and its subsidiary Provider Health Services, LLC and alleges based upon his own direct and independent knowledge:

1. This is an action to recover damages and civil penalties on behalf of the United States of America, arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used, or presented by Central Control and its agents, predecessors, successors, and employees in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729-3733, as amended ("the FCA" or "the Act").

2. Central Control is a Louisiana-based healthcare company that specializes in long-term care. Through its subsidiary, Provider Health Services ("PHS"), Central Control has paid illegal kickbacks to physicians in order to induce referrals to federal healthcare programs, including the Medicare and Medicaid programs. These kickbacks have resulted in millions of dollars of false claims paid by federal healthcare programs for each of the last several years.

Upon information and belief, Central Control continues to implement this illegal business model to this day.

3. As described in more detail below, Central Control, through PHS, provides Nurse Practitioner ("NP") services to patients requiring long-term care. In particular, PHS NPs perform Evaluation and Management ("E&M") services (*i.e.*, office visits) for patients who are admitted to a long-term care facility. PHS seeks and receives reimbursement for those services from federal healthcare programs.

4. In order to win the opportunity to provide these services, PHS must convince the treating physicians at long-term care facilities to hire PHS. As an incentive for and conditioned upon hiring PHS, Defendants pay the physicians illegal kickbacks in the form of monthly per-patient fees to incentivize physicians to refer patients to PHS and to allow PHS nurse practitioners access to their patients so that they can treat these patients and bill CMS for these services.

5. The per-patient fees vary based on the expected volume and value of the services PHS will be able to bill and amount to thousands of dollars in cash for each physician. Because they are paid with the intent of inducing referrals to federal healthcare programs, the fees violate the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b). Each claim submitted by Defendants – or by the treating facility – that was "tainted" by these illegal kickbacks is, in turn, a false claim under the FCA.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S. C. § 1367 and 31 U.S.C. § 3732.

7. This Court has personal jurisdiction and venue over Central Control and PHS pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because that section authorizes

nationwide service of process and because Defendants each have minimum contacts with the United States. Moreover, both Defendants transact business in this District.

8. Venue is also proper in this District pursuant to 31 U.S.C. § 3731(a) because Central Control and PHS can be found in and conduct business in this District. At all times relevant to this Complaint, Central Control and PHS have regularly conducted substantial business within the District, had employees based in Louisiana, and made significant sales within Louisiana – including the conduct at issue in this Complaint.

### III. THE PARTIES

#### A. Relator

9. Relator Dr. Thomas Prose is a resident of the state of Michigan and a citizen of the United States.

10. Dr. Prose is the founder and owner of General Medicine P.C. General Medicine is a collaborative practice of board-certified physicians and advanced nurse practitioners who specialize in the care of post-acute care patients in long-term care facilities. Among others things, General Medicine provides "post-hospitalist" medical services, Skilled Nursing Facility ("SNF") program services, facility medical director services, attending physician services, and advanced nurse practitioner services.

11. Dr. Prose earned his Medical Doctorate, his master's degree in Public Health, and his master's degree in Business Administration from the University of Michigan. He has more than 30 years of experience in internal medicine, geriatrics and health care administration. He founded General Medicine in 1983. Dr. Prose served as medical director at Cigna Insurance Company for their Medicare business. He also served as a medical consultant and member of the

board of directors to a number of organizations, federal and state agencies, insurance carriers and health care systems.

12. For the reasons set forth in this Complaint, Dr. Prose is an "original source," as that term is used in the FCA. *See* 31 U.S.C. 3730(e)(4)(B),

### B. Defendants

13. Central Control is a limited liability company headquartered in Pineville, Louisiana. According to its website, Central Control owns or operates ten long-term care facilities, a behavioral health hospital, and a behavioral health outpatient services facility in Louisiana.

14. PHS is a Delaware limited liability company. Upon information and belief, PHS is a wholly-owned subsidiary of Central Control. PHS contracts with long-term care facilities to provide NP services.

## IV. APPLICABLE LAW

### A. Medicare and Medicaid

15. Medicare is a federally funded and administered health insurance program that provides benefits to certain groups. The program was created by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*. The U.S. Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS").

16. The Medicare program is divided into four components: (1) Part A, the hospital insurance benefits program, 42 U.S.C. §§1395c, 1395d; (2) Part B, the supplemental medical insurance benefits program, which pays for a portion of certain medical and other services, 42 U.S.C. §§ 1395j, 1395k, 1395i; (3) Part C, the Medicare Advantage Program, which allows CMS

to contract with public and private entities to provide Medicare Parts A and B benefits to certain beneficiaries, 42 U.S.C. §1395w-21 *et seq.*; and (4) Part D, the voluntary prescription drug benefit program. 42 U.S.C. § 1395w-101 *et seq.*

17. Title XIX of the Social Security Act (the "Medicaid Act") authorizes federal grants to the states for Medicaid programs to provide medical assistance to persons with limited income and resources. Medicaid programs are administered by the states in accordance with federal regulations. State Medicaid agencies conduct their programs according to a State plan approved by CMS. The state agency responsible for administering the state's Medicaid program pays providers for medical care and services provided to eligible Medicaid recipients.

18. State Medicaid programs are jointly financed by the federal and state governments. The federal government pays its share of expenditures to the states on a quarterly basis according to statements of expenditures submitted by the states and a formula set forth in sections 1903 and 1905(b) of the Medicaid Act.

    **B.   Medicare and Medicaid Coverage for Non-Physician Providers**

19. Medicare Fee For Service ("FFS") pays for certain covered services provided to beneficiaries by Non-Physician Providers, including Nurse Practitioners. For a service rendered by a NP to be covered by Medicare it must be, among other things, medically necessary and provided in collaboration with a physician.

20. Generally, services are considered medically necessary if they meet the standards of good medical practice and are proper and needed for the diagnosis or treatment of the patient's medical condition; are furnished for the diagnosis, direct care, and treatment of the patient's medical condition; and are not mainly for the convenience of the patient, provider, or supplier.

21. Collaboration occurs when the NP works with one or more physicians to deliver health care services within the scope of their professional expertise; and medical direction and appropriate supervision is provided as required by the law of the state in which the services are furnished.

22. Examples of NP services that Medicare reimburses include: taking the patient's history, performing a physical exam, and ordering appropriate laboratory tests and procedures; diagnosing, treating, and managing acute and chronic diseases; providing prescriptions and coordinating referrals; and promoting healthy activities in collaboration with the patient.

23. NPs may bill for covered services using their own National Provider Information number (a unique 10-digit identification number issued by CMS to health care providers), or that of their employer. Medicare pays such services at eighty-five percent (85%) of the Medicare Physician Fee Schedule – *i.e.*, at 85 percent of what Medicare would reimburse a physician for rendering those services.

24. To qualify under FFS, a NP must be a registered professional nurse authorized by the State in which the services are provided to practice as a NP in accordance with state law. In addition, NPs must have obtained Medicare billing privileges as a NP. For those who obtained such privileged after January 1, 2001, NPs must also be certified as a NP by a recognized national certifying body that has established standards for NPs and have a Master's degree in nursing or a Doctor of Nursing Practice degree.

25. NPs may also bill state Medicaid programs for services within their scope of practice as defined by state law. While the services that are reimbursable under Medicaid vary by state, they tend to track those of the Medicare program. Reimbursement rates under Medicaid for NP services are as high as one-hundred-percent (100%) of the FFS physician rates, but more

7

typically are a slightly lower rate than would be paid were a physician to have performed the same services.

    C.    **Anti-Kickback Statute**

26.    The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b) is a criminal statute that prohibits anyone from knowingly or willfully paying or receiving remuneration in exchange for referrals or the purchase of any item or service that may be paid for by a federal healthcare program. The statute arose out of congressional concern that payments or things of value provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to patients. "Remuneration" under the AKS has been broadly interpreted by courts to include anything of value – including office services provided at less than fair market value.

27.    After amendments enacted pursuant to the Affordable Care Act, the AKS now specifically provides that a violation of the statute constitutes a false or fraudulent claim under the FCA. 42 U.S.C. § 1320(g).

V.    **DEFENDANTS' VIOLATIONS OF THE ANTI-KICKBACK STATUTE**

    A.    **PHS's Services**

28.    PHS provides NP services to Medicare and Medicaid beneficiaries who are being treated at long-term care facilities in at least 12 different states, including Louisiana.

29.    Long-term care facilities include nursing homes, skilled nursing facilities, and assisted living facilities, and are designed to provide a variety of services, both medical and personal care, to people who are unable to manage independently in the community.

30.    According to PHS's website, PHS nurses specialize in geriatric care and provide at least the following services for long-term care facilities: making regular rounds at the facility;

providing 24/7 call coverage for long-term care patients; assessing patients, reviewing medications, orders, and laboratory tests; performing annual history and physical assessments; reviewing and responding to abnormal laboratory values; reviewing and responding to pharmacy and consultant recommendations such as psychiatric, dietary, speech therapy, and physical therapy; attending to acute and chronic problems presented on a daily basis; and conducting follow-up visits for patients experiencing acute illness such as infections, respiratory problems, urinary tract disorders, and wound management or, for patients whose chronic condition changes.

31. Upon information and belief, PHS bills those services under its own National Provider Information or that of Central Control.

32. Upon information and belief, PHS enters services contracts with long-term care facilities and it is pursuant to those agreements that PHS's NP services are furnished to the facilities' patient population.

33. Most patients at a long-term care facility are treated by physicians affiliated with the facility (as opposed to the patient's primary care physician prior to admission). Upon information and belief, at all times relevant to this Complaint, PHS has understood that to win contracts with long-term care facilities, it had to convince those physicians to allow PHS to treat their patients and to convince the respective facilities that they should hire PHS.

34. Often, treating physicians at a long-term care facility use the NPs from their own office to provide NP services to their facility's patients. In these cases, either the physician or the physician's practice has to pay for the nurse practitioners salary and benefits.

35. Upon information and belief, at all times relevant to this Complaint, PHS has emphasized to treating physicians of long-term care patients that PHS NPs do not require any

direct physician supervision for the services they render and, thus, by directing a facility to hire PHS, physicians will not taking on any additional burden.

**B. PHS's Scheme**

36. Upon information and belief, at all times relevant to this Complaint, PHS has understood that it had to overcome two significant barriers in order to win opportunities to provide its NP services: (1) the reluctance of physicians to allow access to their patients. (2) the reluctance of physicians to enter into a collaborating relationship with NP's (3) the inclination of the treating physicians to provide the same services themselves or using their office's NPs; and (4) competition from other entities that offer the same or similar services.

37. PHS overcame both of those barriers by offering illegal kickbacks to treating physicians as an incentive to physicians to refer patients to PHS and to allow PHS nurse practitioners access to their patients so that they can treat these patients and bill CMS for these services and to direct long-term care facilities to contract with PHS.

38. More specifically, PHS entered into sham "physician consulting agreements" with treating physicians as a condition of PHS being hired to provide NP services at long-term care facilities. Under these agreements, PHS pays the physician a monthly fee that is based on the facility's monthly average census – *i.e.*, the average number of admitted patients cared for by the facility on a daily basis.

39. Although the consulting agreements purportedly contemplate certain undefined and unspecified "collaborative services" that will be performed by the physician, in reality the fees PHS committed to pay bear no relation to those services. Instead the fees are designed and intended to incentivize treating physicians to direct long-term care facilities to hire PHS.

40. PHS's scheme was a great success. Upon information and belief, dozens of long-term care facilities in over ten states contracted with PHS, driven at least in part by the kickbacks offered to treating physicians affiliated with the facilities.

41. One of these facilities is Ascension Oaks Nursing and Rehabilitation facility in Gonzalez, Louisiana. In 2014, General Medicine approached Ascension Oaks about possibly supplying NP services. During that process, General Medicine was told by the Medical Director of the facility, Dr. Elizabeth Curtis, that she would not hire General Medicine unless the company was willing to provide her a payment similar to the $300 monthly fee she received from PHS. General Medicine refused to engage in this illegal conduct and was not awarded the contract. A copy of Dr. Curtis's "Physician Services Agreement" with PHS is attached hereto as Exhibit A.

42. Other facilities that PHS is believed to have induced to provide Medicare referrals based on illegal kickbacks are identified in Exhibit B.

43. As a direct and intended result of this scheme, thousands of false claims were submitted to Medicare resulting in millions of dollars in reimbursement.

## COUNT I
### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

44. Relator repeats and realleges paragraphs 1-43, as if fully set forth herein.

45. Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment to Medicare or Medicaid for NP services.

46. Specifically, Defendants offered remuneration to providers to induce referrals for services paid for by Medicare or Medicaid. As a direct and foreseeable consequence of

Defendants' illegal conduct, millions of dollars of claims were submitted by providers to Medicare and Medicaid for NP services. Because those claims violated the AKS, they constitute violations of the FCA as well.

47. Because of Defendants' acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of $11,000 for each violation.

## COUNT II
### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

48. Relator repeats and realleges paragraphs 1-47, as if fully set forth herein.

49. Defendants knowingly made or caused to be made false records and statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

50. Specifically, Defendants offered remuneration to providers to induce referrals for services paid for by federal healthcare programs. As a direct and foreseeable consequence of Defendants' illegal conduct, millions of dollars of claims were submitted by providers to Medicare and Medicaid for NP services. Because those claims violated the AKS, they constitute violations of the FCA as well.

51. Because of Defendants' acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of $11,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the Relator requests the following relief:

a. Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of the False Claims Act. 31 U.S.C. §§ 3729-3733.

b. Twenty-five percent (25%) of the proceeds of the action or settlement of the claim if the Government proceeds with the action, and Thirty percent (30%) of the proceeds of the action or settlement if the Government does not proceed with the action. 31. U.S.C. § 3730(d)(1)-(2).

c. Reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. 31 U.S.C. § 3730(d)(1)-(2).

d. Such other relief as the Court deems just and appropriate.

**Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

By: /s/ Conlee Whiteley

Conlee S. Whiteley (La. Bar No. 22678)
**KANNER & WHITELEY, L.L.C.**
701 Camp Street
New Orleans, LA 70130
Telephone: 504-524-5777

Jeffrey S. Gleason (Minn. Bar No. 0396190)
(*Pro Hac Vice Forthcoming*)
Jamie R. Kurtz (Minn. Bar No. 0391792)
(*Pro Hac Vice Forthcoming*)
**ROBINS KAPLAN L.L.P.**
Lasalle Plaza
800 Lasalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Telephone: 612-349-8500

Timothy Q. Purdon (N.D. Bar No. 05392)
(*Pro Hac Vice Forthcoming*)
**ROBINS KAPLAN L.L.P.**
1207 West Divide Ave, Suite 200
Bismark, ND 58503
Telephone: 701-255-3000

*Attorneys for Relator*
*Thomas Prose, M.D.*